[S. F. No. 818.   Department Two.—August 1, 1898.]

## A. S. KERRY, Respondent, v. PACIFIC MARINE COMPANY, Appellant.

SHIPPING — CHARTER-PARTY — IMPLIED OBLIGATION—NEGLIGENCE.—Under a. charter-party containing no express stipulation for the safe delivery of the cargo, but showing that the entire control and management of the vessel, and of the loading and unloading of the cargo, were in the hands of the managing owner of the vessel, there is an implied obligation that the loading and unloading thereof shall be so done as to cause no unnecessary injury thereto, and an implied liability for injury resulting from the negligence of the carrier.

ID.—PERSONAL LIABILITY OF MANAGING OWNER—PRINCIPAL AND AGENT.— The manager or managing owner of a vessel, when acting as general agent for the owners, must disclose his agency unmistakably in a charter-party signed by him, in order to escape liability therein as principal; and where the charter-party was signed by a corporation owning nine-sixteenths of the vessel, which described itself in. the body of the instrument as managing owner, but without disclosing the identity of the other parties represented by it as agent, or their interest in the vessel, and in that assuming to act for them as agent in the execution of the instrument, it is personally liable thereon as principal for any breach of the contract on its part, in respect to the management of the vessel and cargo.

ID.—OWNERSHIP OF CHARTERED VESSEL— When the general control and management of a vessel and crew for a voyage or for a term specified in a charter-party are given up to the charterer, he becomes the owner *pro hac vice;* but when the general owner of the vessel retains possession, command, and navigation thereof, and contracts to carry a cargo on freight for a voyage, the charter-party is a mere contract of affreightment sounding in covenant, and there is no *pro tempore* ownership of the vessel by the charterer, but the responsibility of the general ownership continues throughout the voyage.

ID.—FINDING AS TO PART OWNERSHIP AND AGENCY.—In an action upon a. charter-party signed by the defendant corporation in its individual and corporate capacity, a finding that it was part owner of the vessel, and the manager thereof, and that as such owner, and as agent of the other owners, the defendant made the charter-party, is not prejudicial to the defendant, which is personally liable under the contract, when regarded as part owner and acting as agent for the other owners, even though the other part owners may also be liable.

ID.—ACTION AGAINST PART OWNER — NONJOINDER OF PARTIES — PLEA IN ABATEMENT.—If an action is brought against one or more part owners. upon a contract relating to the ship, which should regularly be brought against all the part owners jointly, the defendants sued can only object to the nonjoinder of other part owners by a.

plea in abatement; and if such plea is omitted, the plaintiff may recover his whole demand, and the defendants must afterward seek contribution from the other owners.

ID.—ACT OF CONGRESS—LIMITATION OF LIABILITY—BREACH OF CONTRACT.— Act of Congress of June 26, 1884, which limits the liability of a shipowner to his proportionate share of all the debts and liabilities, is confined to the liability imposed on the part owners by law, in consequence of their ownership of the vessel, and does not prohibit part owners from so contracting as to become liable for the entire damage for breach of the contract.

ID.—DAMAGES—LOSS ON SALE OF CARGO—PLEADING—FINDING—VARIANCE.— Where the verified complaint in an action for damages for breach of a charter-party specifically alleged as damages the difference in value between the cargo as shipped, and as delivered, owing to the careless and negligent manner in which the cargo was loaded and unloaded, the plaintiff cannot recover any greater measure of damages than that so averred, though a greater sum is alleged in a general *ad damnum* clause; and a finding of a greater amount of damages than such differences in value is at variance with the allegations of the complaint and is not saved by the general *ad damnum* clause.

JUDGMENT IN EXCESS OF PLEADINGS—APPEAL—MODIFICATION.—A judgment for damages, based upon a finding for an amount greater than the averments of the complaint, may be modified on appeal, without the necessity of a reversal of the judgment.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. J. C. B. Hebbard, Judge.

The facts are stated in the opinion of the court.

Naphtaly, Freidenrich & Ackerman, for Appellant.

W. H. Fowler, and D. H. Whittemore, for Respondent.

THE COURT.—Action on a charter-party by which defendant undertook to carry for plaintiff, in the bark "Templar," a cargo of piles from Seattle to San Francisco. Damages are claimed as resulting from the careless and negligent handling of the piles while being loaded and unloaded, whereby the bark on them became peeled off, thus diminishing their value. Plaintiff had judgment for two thousand three hundred and ninety dollars, from which and from the order denying a new trial defendant appeals. The pleadings are verified.

The complaint alleges that defendant is a corporation, and

"as managing owner of the bark 'Templar' of San Francisco
. . . . entered into a contract of charter-party with plaintiff,
. . . . whereby it was covenanted and agreed that the said bark
'Templar' should be chartered, etc. . . . . That defendant
agreed to keep said vessel during said voyage tight, staunch,
and well fitted; that she was to receive the said piles and short
storage as aforesaid, carry the same and deliver them at the port
of San Francisco in good marketable condition and in as good
order and condition as they received the same," etc. The charter-
party purports to be "between the Pacific Marine Supply Com-
pany of San Francisco, California, party of the first part, manag-
ing owner of the bark 'Templar' of San Francisco, . . . . and
A. S. Kerry, of Seattle, Washington, of the second part." By the
terms of the charter-party the first party agreed "on the freight-
ing and chartering of the said vessel unto the said party of
the second part from a voyage from the port of Seattle, Wash-
ington, to San Francisco, California, on the terms following":
(1) That the vessel should be kept tight and staunch, etc., and
well supplied with men and provisions; (2) that all the vessel,
except certain portions for the use of the crew, should be at the
sole use of plaintiff; and defendant agreed (3) "to take and
receive on board the same vessel during the voyage"; then fol-
low the agreements entered into by plaintiff as to cargo to be
furnished, the size of piles at the butt; rate of payment per
lineal foot, regulations as to discharging cargo, etc. The con-
tract is signed as follows: "Pacific Marine Supply Company,
Alfred Greenebaum, Manager, D. M. Kennedy, Agent for A. S.
Kerry."

1. It is contended by defendant that the action is based upon
the breach of the written contract, which nowhere in terms
provides that defendant agreed to deliver the piles in good or-
der and condition as received, and unless there was such im-
plied promise plaintiff cannot recover; that allegations and
proofs must agree, and the proofs must disclose the cause of
action which is alleged in the complaint (citing *Barrere v. Somps*,
113 Cal. 97); and it is claimed that there is a total failure of
proofs upon this point. The contract does not provide in terms
for the safe delivery of the cargo; but the court found that "de-
fendant agreed that the said vessel should receive the said piles,

and carry the same and deliver them at the port of San Francisco in good marketable condition and in as good condition as it received the same." The court also found that the piles when received were in good and marketable condition. These findings are challenged as not supported by the evidence. The court also found that the "defendant was the owner of nine-sixteenths of said vessel and was the manager thereof; that as such owner, and as agent of the owners of the other seven-sixteenths, said defendant made said charter."

It appears in evidence that a receipt for the cargo was signed by John Lee, master (who was also a part owner), which reads: "Seattle, Wash., August 29, 1893. Received from A. S. Kerry, on board the bark 'Templar,' the following packages, contents unknown, to be delivered at San Francisco, Cal., . . . . and with privilege of reshipping on steamboats or barges." Then follows description of cargo.

Defendant by the contract itself let not only the vessel in proper condition "and provided with every requisite" for the service, but it also agreed to furnish "men and provisions necessary for the voyage," and defendant engaged "to take and receive on board the same vessel during the aforesaid voyage," the entire vessel (except cabin, deck, and room for the crew and stowage for sails, cables, and provisions) "to be at the sole use and disposal of" plaintiff. The compensation was fixed by a rate to be charged per lineal foot of the piles and a certain rate for other lumber. Lay days were provided for in loading and unloading, beyond which plaintiff was to pay forty dollars per day for detention. Defendant agreed to receive cargo "delivered alongside the vessel within reach of her tackles," and the charter was to commence "when the vessel is ready to receive cargo at her place of loading and notice thereof is given," and not at San Francisco where she was when chartered. The receipt given shows that the cargo was received on board ship by the master, "to be delivered at San Francisco." The evidence showed that the loading and unloading was done by the crew of the vessel under the direction of the master, who had entire charge and command of the ship. It is evident, we think, that the entire control and management of the vessel and the loading and unloading of the cargo were in the hands

of defendant. Plaintiff was to pay freight at fixed rates on the
cargo when delivered. In such contract as this, there is, we
think, an implied obligation that in loading and unloading
cargo it shall be so done as not to cause unnecessary injury
to the merchandise; and for injury resulting from the negligence
of the carrier there is an implied liability. (Civ. Code, sec.
2114.) It was not necessary, therefore, for plaintiff to prove
an express stipulation in the written contract that the freight
was to be delivered in good condition.

The question, who is to be considered as owner for the voy-
age in cases of charter-party, so as to create a liability for
repairs or breaches of duty, has been often litigated in Eng-
land and Amercia. The principles upon which the cases rest
will be found discussed in Abbott on Shipping, part 1, chapter
1, section 8. In a question of construction it is not possible
to lay down any rule of universal application, but Mr. Abbott
says: "It seems to result from the cases decided upon this sub-
ject that when, by the terms of the charter-party, the master
and mariners are to continue subject to the orders of the ship-
owner, he retaining through them the possession, management,
and control of the vessel, it is to be considered a contract to
carry the freighter's goods, but where the merchant engages
to pay a stipulated price to the shipowner for the use of his
ship, for the voyage, by the month or year—takes it and them
into his service—receiving the freight actually earned by it to his
own use, the master and mariners becoming subject to his or-
ders, and the general management and control of them and the
vessel being given up to him, it is a demise of the vessel with her
crew for the voyage, or the term specified; the charterer becomes
owner *pro hac vice*, entitled to the rights and subject to the re-
sponsibilities which attach to the character." In the case of
*Marcardier v. Chesapeake Ins. Co.*, 8 Cranch, 39, it was said:
"Where the general owner retains the possession, command, and
navigation of the ship, and contracts to carry a cargo on freight
for the voyage, the charter-party is considered a mere affreight-
ment sounding in covenant, and the freighter is not clothed with
the character or legal responsibility of ownership." It certainly
would not be for one moment contended in the case at bar that
the plaintiff would have been liable, under the charter-party

here for damages resulting from collision through the negligence of the master or crew in navigating the chartered vessel. We are unable to see in the contract entered into, as understood and acted upon by all the parties, any element of ownership *pro hac vice* in plaintiff; nor can we see in it such demise of the vessel and crew as would subject the plaintiff to the responsibilities which attach to the character of owner *pro tempore.*

But it is contended that the action is against defendant as managing owner of the vessel, and that there is an entire failure of proof that it was such owner. As we understand defendant's contention, it is that defendant was the manager of the vessel, and as such was the general agent for the owners, and incurred no other liability than to provide for the ship's seaworthiness, to take care of her in port, to see that she was provided with necessary papers, with proper master, mate, crew, and supplies of provisions, and that this relation and this limited liability were not changed by the fact that defendant was part owner or managing owner.

Section 2071 of the Civil Code makes it "the duty of the manager of a ship, unless otherwise directed," to provide for the ship's seaworthiness, etc., as claimed by defendant, but this section does not attempt to define the full extent of the duties and liabilities of the manager, who is also part owner, and who, by section 2070 of the Civil Code is called "the managing owner." Without attempting to define the meaning of this section of the Civil Code in respect of any difference between the powers and duties of a "manager" and a "managing owner," when they act as "general agent for the owners," it seems to us quite clear that when either the manager or managing owner assumes to act as agent he should disclose his agency in some unmistakable manner, if he desires to escape liability as principal.

The charter-party was signed by defendant in its corporate capacity, describing itself in the body of the instrument as managing owner, and the evidence was that it owned nine-sixteenths of the vessel and the master two-sixteenths; but plaintiff did not know when he signed the charter-party who were the owners. Defendant admitted in its answer that it made the contract as managing owner, but denied that it "had any

other connection with said vessel than as managing owner thereof and agent for the owners." Neither in the body of the instrument nor in the signature of defendant does defendant appear or assume to act as agent; and defendant offered no evidence that it was agent, or acting as agent. The customhouse certificate of registration shows other part ownership, but that alone affords no sufficient evidence that defendant did not intend to be bound as principal, for, having possession and control of the vessel, and having employed her master, the plaintiff might well assume that defendant was contracting for itself in respect of the vessel. The most that can be claimed under section 2070, *supra*, for defendant as managing owner, is that the contract indicated that defendant was negotiating for third parties, as well as for itself as part owner; but defendant did not disclose the identity of these other parties, nor their interest in the ship nor did it attempt to bind anyone but itself.

It was stated by Mr. Story that "when, upon the face of the instrument, the agent signs his own name only, without referring to any principal, then he will be held personally bound, although he is known to be or avowedly acts as agent." (Story on Promissory Notes, sec. 68.) And it is only where the true object and intent to bind the principal, and not the agent, can be collected upon the whole instrument that courts of justice will adopt that construction. (Story on Promissory Notes, sec. 69.)

It was said in *Murphy v. Helmrich*, 66 Cal. 71: "Where an agent does not attempt, in an instrument, to bind his principal, and in terms imposes the obligation on himself, the rule is, that he incurs by such act a personal liability, even though he described himself as an agent." (See, also, *Hobson v. Hassett*, 76 Cal. 203; 9 Am. St. Rep. 193.)

2. The court found that defendant "was the owner of nine-sixteenths of said vessel, and was the manager thereof; that as such owner and as agent of the owners of the other seven-sixteenths said defendant made said charter."

Appellant claims that this finding is outside the issues in the case, and that defendant cannot be made liable in this case as part owner. Defendant was sued as liable under the contract because it signed the contract in its individual and corporate

capacity. It was, perhaps, unnecessary to inquire into the ownership of the vessel. But the finding that defendant was part owner was not prejudicial to defendant, for it is liable under this contract when regarded as part owner and acting as agent for the other owners, even though the other part owners may also be liable. Mr. Story in his work on Agency, section 278, says: "Nothing is more common than for a contract to be made by which the agent is personally bound, and which yet is, *ex consequenti*, binding on the principal also, although the latter is not a direct and immediate party to the instrument. . . . .The more correct and satisfactory doctrine would seem to be that where the agent is a direct party of the instrument and the principal is not, so that the latter is not, *ex directo*, suable thereon, there the agent, although he describes himself as agent, is suable upon the covenants and agreements contained therein as his own personal contract." And the doctrine is extended to the master contracting within the ordinary scope of his powers and duties; and the rule "is said to have been introduced in favor of commerce, so that merchants may not be compelled to seek after the owners to sue them, but that they may have a twofold remedy against the owners and against the master." (Story on Agency, sec. 294.)

Mr. Abbott says: "If an action is to be brought against the part owner upon a contract relating to the ship, although regularly such action should be brought against all jointly, yet, if all are not sued the defendants can only avail themselves of the objection by a plea in abatement; and if they omit to plead such a plea the plaintiff will recover his whole demand, and the defendants must afterward call upon the others for contribution." (Abbott on Shipping, pt. 1, c. 3, sec. 7, *116; Code Civ. Proc., secs. 433, 434.)

3. It is claimed that defendant's liability is limited by section 18 of the act of Congress of June 26, 1884, to nine-sixteenths of plaintiff's damage. (Supplement to Rev. Stats. 1874-91, p. 443.) This section provides: "That the individual liability of a shipowner shall be limited to the proportion of any and all debts and liabilities that his individual share of the vessel bears to the whole." Respondent claims that this act does not apply, and that if it does defendant has not taken the re-

·quired steps to limit its liability, and, furthermore, that defendant cannot have relief in this action and this forum, but must resort to a court of admiralty jurisdiction.

There is nothing in the act of Congress prohibiting part owners to so contract as to become liable for the entire damage, whatever it may be; and, as we think defendant made such contract in this case, the act of Congress is not available to defendant to limit its liability, and need not be considered.

In *Carver's case*, 35 Fed. Rep. 665, it was held that the act of 1884 "does not restrict the liability of the owners upon their own personal contracts, but only their liability 'on account of the vessel'; that is, the liability that is imposed on them by law in ·consequence of their ownership of the vessel, viz., for the contract or acts of the ship or her master without the owner's express intervention." (*Gokey v. Fort*, 44 Fed. Rep. 364.)

4. Appellant contends that the evidence is insufficient to show· that the piles were barked through defendant's fault or carelessness in loading or unloading. There was much evidence tending to show that the damage to the piles was the direct result of their being handled in a careless and negligent manner. Other evidence tended to show that the piles were in bad condition when delivered to the vessel, and had been previously injured. The evidence was conflicting upon the point, and we cannot, under the settled rule, pass upon its relative weight.

5. The court found that plaintiff delivered to the vessel forty-seven thousand eight hundred lineal feet of piles, which were delivered in San Francisco and were worth when received at the vessel fourteen cents per lineal foot, but were worth only nine cents per lineal foot as delivered at San Francisco, and plaintiff was compelled to sell at that price. The damage found was this difference in value. It is claimed that because the complaint alleged that plaintiff was obliged to dispose of the piles at nine and one-half cents per lineal foot, the finding by the court is in excess of the amount of damage claimed by plaintiff in his pleadings. In his verified complaint plaintiff alleged: "That owing to the careless and negligent manner in which defendant handled the said cargo the said plaintiff was obliged to dispose of the said piles at the rate of nine and one-half cents per lineal foot"; again, that the piles were worth fourteen cents per lineal

foot in San Francisco if they had been delivered as received, "but that nine and one-half cents was all that plaintiff could procure for them in San Francisco, and all that they were worth in the condition in which they were delivered," etc.

There is a general averment of damages to the effect that by reason of the careless and negligent manner in which the defendant handled the piles plaintiff was damaged in the sum of three thousand dollars. From these allegations it appears that plaintiff not only has alleged that his direct loss by reason of the injury to the piles was the difference between fourteen cents per foot and nine and one-half cents, but, additionally, he has alleged the fact that he sold them for nine and one-half cents. This being so, his damages from this cause could not have exceeded four and one-half cents per foot. He is allowed damages, however, at the rate of five cents per foot. It is said that the evidence supports this finding. However that may be, the finding is at variance with the allegation of the complaint. It is fundamental that in such an action a man may not recover in damages an amount greater than that which he pleads will compensate him for his injuries. The finding is not saved by the general *ab damnum* clause above referred to. That averment is not inconsistent with the idea that the direct damage was the difference between nine and one-half cents and fourteen cents, and that other consequential damages for which defendants are responsible raised the amount to three thousand dollars. It is quite apparent that plaintiff has been allowed for the injury to the piles a sum for damages one-tenth greater than that for which he asks in his complaint.

The finding of damage is for an amount greater than the complaint avers. Still, the finding necessarily establishes that plaintiff was damaged to the amount which he claims. The judgment may, therefore, be modified, and it will still be supported by the finding in question. All other propositions having been resolved in favor of plaintiff and respondent, it would be a hardship to compel a new trial if that result could properly be avoided. We think this may be done for the reasons indicated, which reasons find support in many cases. (*Fischer v. Blank*, 138 N. Y. 669; *Cox v. Burlington etc. Ry. Co.*, 77 Iowa, 478; *Miller v. Wilkens*, 79 Ga. 675; *Frankhouser v. Cannon*, 50 Kan. 621; *Miller v. Fulstone*, 20 Nev. 260.)

The judgment of reversal is vacated. The court below is directed to modify its judgment by reducing the same in the sum of two hundred and thirty-nine dollars or one-half of one cent per lineal foot for all of the piles. It is further ordered that appellant have his costs upon this appeal.

Hearing in Bank denied.